UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 2/19/09

------------------------------------------------------------------------x

NEW YORK MARINE AND GENERAL
INSURANCE COMPANY,

                Plaintiff,

  -against-

LAFARGE NORTH AMERICA, INC.,

                Defendant.

                05 Civ. 9612 (CSH)

------------------------------------------------------------------------x

THE NORTHERN ASSURANCE COMPANY
OF AMERICA and AMERICAN HOME
ASSURANCE COMPANY,

                Plaintiffs,

  -against-

LAFARGE NORTH AMERICA, INC. and
AMERICAN STEAMSHIP OWNERS MUTUAL
PROTECTION AND INDEMNITY
ASSOCIATION, INC.,
                Defendants.

                08 Civ. 3289 (CSH)

                MEMORANDUM OPINION
                AND ORDER

------------------------------------------------------------------------x

       This Opinion resolves dispositive motions filed in two consolidated declaratory judgment

actions filed in this Court to determine coverage under policies of marine insurance issued to Lafarge

North America, Inc. ("Lafarge") with respect to claims asserted against Lafarge following Hurricane

Katrina.

.

## I. BACKGROUND

**A. Barge ING 4727 and Hurricane Katrina**

Lafarge, a diversified construction materials company and supplier of concrete and cement, obtained policies to insure itself against legal defense costs and liability claims that might arise out of Lafarge's use of vessels transporting cement in inland waterways. In August 2005, Lafarge arranged for the use of Barge ING 4727 (sometimes "the Barge"), owned by Ingram Barge Company ("Ingram"), to carry a cement cargo from Lafarge's plant in Illinois down river for unloading at Lafarge's facility on the Inter Harbor Navigational Canal in New Orleans, Louisiana.

On August 29, 2005, Barge ING 4727 lay at the Lafarge facility, having discharged her cargo. Hurricane Katrina made landfall at New Orleans that day. The Barge broke free from her moorings. After the storm had subsided, she was found to have come to rest on the land side of the 17th Street Industrial Canal floodwall (or "levee") separating Inner Harbor Navigation Canal from the Lower Ninth Ward in New Orleans. The levee had collapsed, causing massive flooding in the Lower Ninth Ward.

Lafarge has been named as one of several defendants in a number of actions filed in New Orleans by residents and business owners in the Lower Ninth Ward. These actions include claims for wrongful death, personal injury, and property damage. The plaintiffs allege that after Barge ING 4727 broke free of her moorings, she collided with and caused or contributed to the failure of the levee and the consequent flooding of the Lower Ninth Ward. Hundreds of claimants, with claims in the billions of dollars, have sued Lafarge. Various plaintiffs have sought class certification for putative classes numbering 40,000 claimants. One group of plaintiffs has asserted a demand of $100 billion.

2

Lafarge contends that the failure of the levee occurred before Barge ING 4727 approached it, and that the Barge was merely carried over or drawn through the already breached levee. In other words, the case for Lafarge is that the breakaway of the Barge was not a cause in fact of the flooding.

The merits of these claims will be adjudicated in the United States District Court for the Eastern District of Louisiana. Nevertheless, unless and until the liability issues are decided in its favor, Lafarge will continue to incur high legal defense and investigative expenses, and faces liability claims that substantially exceed the limits of the several insurance policies involved.

Questions of coverage under the several policies obtained by Lafarge have been previously adjudicated by this Court or are resolved in this Opinion. I will summarize the policies in suit.

## B.     The Policies of Marine Insurance Obtained by Lafarge

The policies described in this section were all in effect at the time of the Hurricane Katrina catastrophe and the breakaway of Barge ING 4727.

### 1.     *The Primary Policy*

New York Marine and General Insurance Company ("NYMAGIC") issued to Lafarge a Primary Marine Liabilities Policy of Insurance for the period of May 1, 2005 to May 1, 2006 ("the Primary Policy"). The Primary Policy has an aggregate limit of $5,000,000 for any one incident or occurrence. The policy obligated NYMAGIC to pay for expenses and legal costs incurred by Lafarge as the result of an alleged liability covered by the policy, subject to certain additional provisions considered *infra*. There is no dispute that Lafarge's potential liability for the damage allegedly caused by her breakaway during Hurricane Katrina is covered by the Primary Policy.

3

### 2. *The American Club's P & I Policy*

The American Steamship Owners Mutual Protection and Indemnity Association, Inc. ("the American Club") issued to Lafarge a Protection and Indemnity Policy ("P & I") ("the American Club Policy") which, in respect of vessels and incidents covered by the policy, obligated the American Club to pay Lafarge's legal defense costs ("Protection") and indemnify it against claims for liability ("Indemnity"), subject to limitation in amounts as "Per Club Rules."

In an earlier opinion, familiarity with which is presumed, this Court held that Barge ING 4727 was not a covered vessel under the American Club Policy, and consequently the American Club was not obligated to pay Lafarge's costs incurred as a result of the Hurricane Katrina incident, or to indemnify it for liability. *American Steamship Owners Mutual Protection and Indemnity Association, Inc. v. Lafarge North America, Inc.*, No. 06 Civ. 3123, 2008 WL 4449353 (S.D.N.Y. Sept. 29, 2008) ( *"American Club"*). Lafarge filed a notice of appeal to the Second Circuit. The appeal is pending.

### 3. *The Excess Policy*

In addition to issuing the Primary Policy to Lafarge, NYMAGIC also subscribed, together with American Home Assurance Company ("AHAC") and The Northern Assurance Company of America ("NACA"), to an Excess Marine Liability Policy of Insurance issued to Lafarge ("the Excess Policy"). NYMAGIC subscribed to 40% of the risk under the Excess Policy, AHAC to 35%, and NACA to 25%, all on a several and not joint basis. These three companies subscribing to the Excess Policy will sometimes be referred to collectively as "the Excess Insurers." The Excess Policy covered Lafarge for liability and expenses in excess of the coverage provided by the other policies, up to $45,000,000, and under certain circumstances $50,000,000.

4

## C.     The Actions Filed in this Court

The breakaway of Barge ING 4727 during Hurricane Katrina, in addition to generating multi-million dollar damages actions by third parties against Lafarge and others in the Eastern District of Louisiana, also gave rise to three declaratory judgment actions in this Court between Lafarge and its insurers, or between the insurers themselves.  These actions pray for declaratory judgments with respect to the several insurers' obligations to pay Lafarge's defense costs and indemnify it against liability.  These  issues of coverage, turning principally upon the proper construction of the policies themselves, are appropriate for summary disposition. The three actions are summarized as follows.

### 1.     *Docket Number 05 Civ. 9612*

NYMAGIC brought this action against Lafarge for declaratory relief.  NYMAGIC's complaint, which relates solely to the Primary Policy,  alleges that Lafarge gave NYMAGIC notice of the Barge ING 4727 breakaway;  NYMAGIC advised Lafarge it would retain and pay for counsel in New Orleans to protect Lafarge's interests if claims were asserted against it as the result of the incident; Lafarge advised NYMAGIC, before any claims were asserted, that it had retained law firms in New Orleans, New York, and Washington, D.C. to protect its interests, and expected NYMAGIC to pay for or reimburse Lafarge for the fees and expenses of those firms; and NYMAGIC thereafter advised that it had retained a different law firm in New Orleans to defend Lafarge. In these circumstances, NYMAGIC's complaint asserts three causes of action against Lafarge,  for judgments declaring:

(1) NYMAGIC has no obligation under the Primary Policy to pay fees and expenses except those for which it specifically agreed to pay (which did not include the three firms Lafarge had retained).

(2) NYMAGIC had the right under the Policy to direct the defense of any action against Lafarge, and had fulfilled its obligations under the Policy by retaining counsel in New Orleans to defend Lafarge.

(3) If NYMAGIC was obligated to pay any fees and expenses other than those for which it had agreed to pay, that obligation was limited to reasonable fees and expenses relating directly to the defense of any claims against Lafarge.

## 2. *Docket Number 06 Civ. 3123*

The American Club brought this action against Lafarge for a declaration that the American Club Policy issued to Lafarge did not cover Barge ING 4727 and the claims arising out of the Hurricane Katrina incident. Large contended that the policy did cover the barge. The parties cross-moved for summary judgment. As noted in Part I.B.2., the Court held that the policy issued by the American Club did not cover the barge. Lafarge's appeal from that holding is pending.[1]

---

[1] While the cross-motions of the American Club and Lafarge for summary judgment in 06 Civ. 3123 were being briefed, NACA and AHAC, two of the Excess Insurers, applied to consolidate 08 Civ. 3289 with 06 Civ. 3123, and sought leave to intervene in 06 Civ. 3123 for the purpose of filing papers in opposition to the American Club's motion for a summary judgment that the policy it issued to Lafarge did not cover Barge ING 4727 and the Katrina claims. The Court, in the exercise of its discretion, denied these applications, on the grounds that they would delay resolution of the American Club Policy issue, with consequent continuing complications for the liability litigation in the New Orleans court, and Lafarge had the same economic motive as the Excess Underwriters to argue that coverage existed under the American Club Policy. *See* the opinion reported at 2008 WL 3457220 (S.D.N.Y. Aug. 12, 2008).

**3.**     *Docket Number 08 Civ. 3289*

NACA and AHAC, suing as Excess Insurers, brought this action for declaratory relief against Lafarge and the American Club. Their complaint was filed on April 2, 2008, while the American Club action against Lafarge, No. 06 Civ. 3123, for a declaration of non-coverage was pending but not yet decided. NACA and AHAC assert four causes of action, for judgments declaring:

(1) The American Club's denial of coverage to Lafarge is invalid and there is coverage under the Club P & I policy "for, at a minimum, the cost paying for defending all underlying Katrina Claims and related litigations."

(2) The Excess Policy issued by NACA and AHAC, together with "the non-party NYMAGIC," to Lafarge "does not respond" (in other words, the policy does not pay Lafarge anything) until the full $5,000,000 per incident has been paid under the Primary Policy, and Lafarge has paid from its own funds the full amount which should have been paid under the American Club Policy "but for [Lafarge's] failure to comply with the requirements to have the Barge ING 4727 validly entered for coverage" with the Club.[2]

(3) NACA and AHAC, together with "the non-party NYMAGIC," are not liable to reimburse Lafarge for payments to the several law firms engaged by Lafarge without the consent of the insurers.

(4) The Excess Policy "is excess to the available coverages" under both the Primary Policy and the American Club Policy. The practical effect of such a declaration would be that Lafarge's

---

[2] The careful reader will note that the Excess Insurers' first two causes of action are pleaded in the alternative. The first assumes that the American Club Policy covered the barge; the second assumes that it did not.

coverage under the Primary Policy and American Club Policy must be exhausted before the Excess Insurers are required to provide any coverage to Lafarge.

NYMAGIC, understandably dissatisfied with its status as a "non-party" in this action commenced by its fellow Excess Insurers, filed a motion entered by the Clerk on July 16, 2008 for an order granting it leave to intervene as a party plaintiff. The Court granted NYMAGIC's motion in an order dated October 8, 2008. The intervenor's complaint filed by NYMAGIC asserts four causes of action:

(1) Against the American Club, for a judgment declaring that the American Club's denial of coverage under the American Club Policy is invalid.

(2) Against Lafarge, for a judgment declaring that Lafarge breached the Maintenance of Underlying Insurance provision in the Excess Policy, thereby deferring payments under the Excess Policy until the Primary Policy's limit has been exhausted and Lafarge has paid the full amount that the American Club Policy would have paid if coverage existed under it.

(3) Against Lafarge, for a judgment declaring that Lafarge breached the Naming Attorneys provision in the Primary Policy, thereby relieving the Excess Insurers of any obligation to reimburse Lafarge for payments to attorneys retained by Lafarge without the consent of the Insurers.

(4) Against the American Club and Lafarge, for a judgment declaring that the Excess Policy is excess to the available coverages under both the Primary Policy and the American Club Policy.

It will be observed that in large measure NYMAGIC's prayers in intervention track those of AHAC and NACA, the original plaintiffs. That is not surprising, since all three insurers, having subscribed to the Excess Policy, are in the same boat and intent upon bailing it out.

8

The Court consolidated 05 Civ. 9612 and 08 Civ. 3289 for all purposes in an order entered on October 8, 2008.

**D.     The Pending Motions**

There are four pending motions.  This Opinion resolves them all.  The motions may be summarized as follows.

**1.**     The American Club moves in No. 08 Civ. 3289 to dismiss the claims asserted  against it by the original plaintiffs, NACA and AHAC, and the intervenor plaintiff, NYMAGIC;  or, alternatively, for summary judgment on those claims.

**2.**     NYMAGIC moves in No. 05 Civ. 9612 for summary judgment on all three of its causes of action against Lafarge, and in No. 08 Civ. 3289 for summary judgment on its third cause of action against Lafarge.

**3.**     NACA and AHAC move in No. 08 Civ. 3289 for summary judgment on their first and fourth

causes of action against the American Club, and for summary judgment on their second and fourth causes of action against Lafarge.

**4.**     Lafarge moves in No. 08 Civ. 3289 for summary judgment on all causes of action asserted against it by NACA, AHAC, and NYMAGIC.

A number of these motions have given rise to reciprocal cross-motions.

9

## II. DISCUSSION

### A.    Preliminary

These actions for declaratory relief are motivated by forces as old as Genesis. Following the Apple Catastrophe, Adam blamed Eve; Eve blamed the Serpent; and Judgment was entered against all three.[3]  When a catastrophe is covered by several policies of insurance, the Insured prefers to be paid by all the Insurers; each Insurer prefers to pay the Insured nothing; but if one Insurer must pay, it prefers that the other Insurers pay more. I am not critical of these preferences. They result from rational bottom-line considerations, not to mention human DNA.

This Court has decided the action on the American Club Policy. The Court held in *American Club* that the policy did not cover Barge ING 4727 at the time of Hurricane Katrina. While that holding has been appealed, for the present it is the law of the case. The effect of that holding is that Lafarge cannot receive any payment under the American Club Policy. That in turn has an effect upon the Excess Insurers' obligations to Lafarge, which must be taken into account in deciding the present motions. If Lafarge's appeal succeeds and the Court of Appeals reverses this Court's decision with respect to the American Club Policy, the deck of coverage cards will have to be reshuffled.

### B.    Standards of Review

#### 1.    *Motion to Dismiss*

The American Club moves pursuant to Fed.R.Civ.P. 12(b)(6) to dismiss the claims asserted against it by NACA, AHAC and NYMAGIC in No. 08 Civ. 3289.

---

[3]  Genesis 3: 1-19.

A complaint is subject to dismissal under Rule 12(b)(6) if it fails "to state a claim upon which relief can be granted." For decades, lower federal courts quoted and applied the Supreme Court's reference in *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957) to "the accepted rule that complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief."

However, in 2007 the Court decided *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 127 S.Ct. 1955 (2007), which abrogated *Conley*'s oft-cited standard. The *Twombly* Court explained that a literal application of *Conley*'s "no set of facts" rationale is improper because "a wholly conclusory statement of claim would survive a motion to dismiss whenever the pleadings left open the possibility that a plaintiff might later establish some 'set of [undisclosed] facts' to support recovery." 127 S.Ct. at 1968. Instead, the Court emphasized that "[f]actual allegations must be enough to raise a right to relief above the speculative level," *id*. at 1965, and to survive a motion to dismiss a plaintiff must allege "enough facts to state a claim that is plausible on its face." *Id*. at 1974.

The Second Circuit has interpreted *Twombly* to require "a flexible 'plausibility standard,' which obliges a pleader to amplify a claim with some factual allegations in those contexts where such amplification is needed to render the claim *plausible*." *Iqbal v. Hasty*, 490 F.3d 143, 157-58 (2d Cir. 2007) (emphasis in original), *cert. granted sub nom. Ashcroft v. Iqbal*, 128 S.Ct. 2931 (2008). It must also appear from the complaint that the plaintiff has standing to assert its claim. While courts must accept as true all well-pleaded factual allegations in the complaint and draw all

reasonable inferences in the plaintiff's favor, *Ruotolo v. City of New York*, 514 F.3d 184, 188 (2d

cir. 2008), they "are not bound to accept as true a legal conclusion couched as a factual allegation."

*Papasan v. Allain* 478 U.S. 265, 286 (1986).

## 2.    *Motions for Summary Judgment*

All the other motions and cross-motions before the Court are for summary judgment

pursuant to Fed.R.Civ.P. 56.

Summary judgment is appropriate where "there is no genuine issue as to any material fact"

and "the moving party is entitled to judgment as a matter of law." "A fact is material when it might

affect the outcome of the suit under governing law. An issue of fact is genuine if the evidence is

such that a reasonable jury could [have] return[ed] a verdict for the [non-moving party]." *Miner*

*v. Clinton County*, 541 F.3d 464, 471 (2d Cir. 2008) (first two brackets in original; third added)

(citing and quoting *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 202 (2d Cir. 2007)).   In

the cases at bar, New York law governs.   When ruling on a motion for summary judgment, courts

are required to construe the evidence in the light most favorable to the non-moving party and to

draw all reasonable inferences in its favor. *World Trade Center Properties , L.L.C. v. Hartford Fire*

*Insurance Co.*. 345 F.3d 154, 165-66 (2d Cir. 2003).

The cases at bar turn upon the proper construction of insurance policies on essentially

undisputed facts.   "Summary judgment may be appropriate in cases of contract interpretation,

whether before or after discovery." *American Club Opinion*, 2008 WL 4449353, at \*5 (footnote

omitted).   Further standards applicable to cases of contract construction are set forth in that opinion,

2008 WL 4449353, at \*5-\*6, and will be applied in this one.

## C.      The American Club's Motions Against the Excess Insurers

The American Club moves under Rule 12(b)(6) to dismiss the claims of the Excess Insurers against it on two grounds: lack of standing, and *res judicata*.

First, the American Club points out that the Excess Insurers are not named parties to the American Club Policy, and contends that they cannot qualify as third-party beneficiaries of it. In those circumstances, the American Club concludes, the Court should dismiss the Excess Insurers' declaratory judgment actions against it because the Excess Insurers "are mere strangers or non-parties to that contract of insurance between the American Club and Lafarge, and thus they do not have standing to challenge its validity in a declaratory judgment action." Main Brief at 4.

Second, the American Club asserts that since this Court held in *American Club* that the policy it issued to Lafarge did not cover Barge ING 4727, the doctrines of issue preclusion and claim preclusion bar the Excess Insurers from contending to the contrary in their claims against American Club in No. 08 Civ. 3289.

Alternatively, the American Club moves for summary judgment on the Excess Insurers' claims against it, on the basis of the Court's holding of non-coverage in *American Club*. While the Rule 56 summary judgment vehicle is procedurally different from the second ground for the American Club's Rule 12(b)(6) motion to dismiss the Excess Insurers' claims, their substantive bases are the same, namely, the effect of the Court's *American Club* decision in 06 Civ. 3123 upon the claims the Excess Insurers assert against the American Club in 08 Civ. 3289.

The Excess Insurers dispute all the American Club's contentions. They cite New York cases for the proposition that the Excess Insurers are intended third-party beneficiaries of the American Club Policy and consequently have standing to contest the question of whether the policy covered

13

Barge ING 4727. The Excess Insurers contend that issue preclusion and claims preclusion do not

apply to bar their claims against the American Club, principally because in the American Club case,

06 Civ. 3123, "Lafarge could not have adequately represented Excess Insurers' interests due to the

contradictory positions between Lafarge and Excess Insurers." Brief for NACA and AHAC at 6.

That brief at 7-8 describes the "contradictory positions" perceived by the Excess Insurers:

> In particular, there is a dispute between Excess Insurers and Lafarge
> over whether Lafarge has breached its obligation to maintain certain
> underlying insurance policies (for instance with respect to the Club's
> P&I Policy), under the Maintenance of Underlying Insurance Clause
> in the Excess Policy. This is directly tied to the question of whether
> the club coverage exists for the Katrina claims against Lafarge.
> Lafarge contends it was its intention to secure and did in fact secure
> coverage for precisely the types of claims asserted against it in the
> Katrina litigations. The Club disputes this contention. . . . .The
> interests of Excess Insurers and Lafarge are obviously adverse in that
> if Lafarge breached its obligation to maintain the Club coverage as it
> intended for the purpose of covering precisely the claims at issue,
> then that breach would result in a gap in the Club cover amounting to
> a self-insured retention for Lafarge.

Counsel for NACA and AHAC are aggrieved. They feel that the Court treated them unfairly

by denying their application to participate in the American Club action, *see* footnote 4, *supra,*

thereby committing the judicial sin of failing to "[take] care to protect the nonparty's interest." Brief

at 9 (citation omitted). I accept the sincerity of counsel's feelings, but cannot follow their reasoning.

The interests of Lafarge and the Excess Insurers were not "adverse" with respect to the question of

whether the American Club Policy covered Barge ING 4727. Quite to the contrary: on that question

(which was the only question posed by the summary judgment cross-motions in 06 Civ. 3123) the

interests of Lafarge and the Excess Underwriters were 100% aligned: they all desired coverage for

the barge under the Policy. The interests of Lafarge and the Excess Underwriters would become

adverse only if the Court determined that the American Club Policy did not cover the barge, thereby

14

setting the stage for a claim by the Excess Underwriters that Lafarge did not maintain the primary coverage required by the excess policies. And indeed, those circumstances have come to pass: the Court held that the American Club Policy did not cover Barge ING 4727, which prompted the Excess Underwriters to assert just that claim against Lafarge in 08 Civ.3289. But all this does not alter the fact that on the question of coverage under the American Club Policy, the interests of Lafarge and the Excess Underwriters were identical, not adverse. Counsel for Lafarge argued for coverage with great skill. Their arguments did not persuade this Court. They may persuade the Court of Appeals.

However, I need pursue these considerations no further. I assume without deciding that the Excess Underwriters have standing to assert claims against Lafarge in 08 Civ. 3289, and those claims are not barred by issue or claim preclusion. I have considered whether the Excess Underwriters' opposition to the American Club's dispositive motion has merit. I conclude that it does not.

In opposing the American Club's motion, NACA and AHAC incorporate by reference the briefs they filed in support of their motion for summary judgment against the American Club in 08 Civ. 3289. The core contention of those briefs is that *American Club* was wrongly decided: that is to say, the Court erred in holding that the American Club Policy did not cover the Barge ING 4727 and the Katrina claims against Lafarge. Unless I am persuaded that *American Club* was wrongly decided and renounce its holding, the Excess Insurers have no viable claims against the American Club, and no viable opposition to the American Club's dispositive motion against them.

I am not persuaded. The briefs for the Excess Insurers cite some additional cases and rearrange the arguments to some degree, but *au fond* they make the same arguments on contract construction that Lafarge made in *American Club* and the Court rejected. I adhere to the holding of

15

non-coverage in *American Club*. It follows that the American Club's motion for summary judgment dismissing the claims of NACA, AHAC and NYMAGIC against it in 08 Civ. 3289 is granted.

**D.     The Excess Underwriters' Motions for Summary Judgment Against the American Club**

As stated in Part II.C., the Court adheres to its holding in *American Club* that the American Club Policy did not cover the Barge ING 4727 and the Katrina claims against Lafarge. There is therefore no viable basis for any claims against the American Club by the initial plaintiff Excess Insurers in 08 Civ. 3289, NACA and AHAC, or by the intervenor plaintiff and Excess Insurer, NYMAGIC. The motions by the Excess Insurers for summary judgment against the American Club are denied.

**E.     The Motions Involving Lafarge and the Excess Insurers**

In view of the conclusions reached in Parts II.C. and II.D. of this Opinion, the American Club departs from these consolidated cases. We are left with the spate of motions and cross-motions for summary judgment which pit Lafarge and the Excess Insurers against each other.

Some preliminary observations will be useful. It is common ground that by now NYMAGIC has paid $5,000,000 in fees and costs for investigation and preliminary legal representation in respect of the failure of the levee during Hurricane Katrina, and the claims asserted against Lafarge on the theory that the breakaway Barge ING 4727 caused or contributed to the levee's failure. Those payments exhaust the Primary Policy. In consequence, the questions left for adjudication all relate to coverage under the Excess Policy.

16

The remaining motions may be distilled into three principal questions:

(1) Does the Court's holding, that the American Club Policy did not cover Barge ING 4727, establish a breach by Lafarge of the Maintenance of Underlying Insurance provision in the Excess Policy, with the result that Lafarge has a self-insured retention of an amount equal to the limits of the American Club Policy, which must be exhausted before the Excess Insurers need respond?

(2) Are the Excess Insurers liable to pay any attorneys' fees and expenses incurred or to be incurred by Lafarge for services rendered by the three law firms Lafarge retained immediately after the Barge incident, without the Insurers' knowledge or consent?

(3) If Question 2 is answered in the affirmative, are the attorneys' fees and expenses for services (a) covered by the Excess Policy and (b) reasonable in amount?

I consider these questions in that order.

### 1. *Lafarge as Self-Insurer? The Maintenance of Underlying Insurance Provision*

As noted, in *American Club* this Court held that the American Club Policy did not cover Barge ING 4727. One consequence of that holding is that the American club is under no obligation to protect Lafarge (principally by paying legal and investigative costs) against claims for Hurricane Katrina, or to indemnify Lafarge for liability for such claims. Another consequence is that the Excess Insurers' obligations to pay Lafarge's protection and indemnity amounts (up to the limit of the Excess Policy) attach earlier than they would if the American Club Policy covered the Barge. That is because, under the scheme of policies obtained by Lafarge, the amounts due under the Primary Policy and the American Club Policy must be exhausted before the Excess Policy attaches and the Excess Insurers become obligated to pay Lafarge anything.

17

The case for the Excess Insurers is that the Excess Policy required Lafarge to maintain and

keep in full effect all other policies listed as the underlying insurance in the Excess Policy. The

American Club Policy is listed in the Excess Policy's "Schedule of Underlying Insurance." This

Court held that the American Club Policy did not cover Barge ING 4727. Therefore, the Excess

Insurers contend, "Lafarge failed to maintain the Club's cover (whether inadvertently or otherwise)."

Brief for AHAC and NACA dated December 11, 2008 at 7. That failure, the argument proceeds,

constituted "a breach of the Maintenance of Underlying Insurance provision in the Excess Policy.

The result is that the gap in the Club coverage becomes Lafarge's self-insured retention." *Id.*

(footnote omitted).

The Excess Policy provision upon which the Excess Insurers rely is found in Paragraph 11

of the Excess Marine Liabilities Conditions. Paragraph 11 provides in pertinent part:

### MAINTENANCE OF UNDERLYING INSURANCE:

A. It is a condition of this policy that the Section(s) or Policy(ies) referred to below in the "Schedule of Underlying Insurance" shall be maintained in full effect during the currency of this insurance except for any reduction in the aggregate limit(s) contained therein solely by payment of claims in respect of accidents and/or occurrences, occurring during the term of this Policy.

B. Inadvertent failure of the Assured to comply with Paragraph A above or inadvertent failure to notify this Company of any changes in the Underlying Insurances shall not prejudice the Assured's rights of recovery under this Policy, but in the event of such failure, this Company shall be liable only to the same extent as they [*sic*] would have been had the Assured complied with the said condition.

The Schedule of Underlying Insurance referred to in Paragraph 11 follows immediately

thereafter. The Schedule is comprised of three columns, captioned "Policy," "Underwriter," and

"Limits of Liability/Coverages." It lists NYMAGIC as the insurer of "Primary Marine Liabilities"

18

with a limit of $5,000,000 "per occurrence" for several kinds of liability and a $5,000,000 "Combined Occurrence Aggregate" limit. Underneath the sub-caption "P&I Policies," Lafarge is listed as holding a policy with "American Steamship Owners Mutual P&I Association" (the American Club), whose limits of liability/coverage are described in the Schedule as "Per Club Rules for Protection & Indemnity (including 4/4ths Collision Liability)."

The Excess Insurers contend that in breach of Paragraph 11(A), "Lafarge failed to maintain the Club cover (whether inadvertently or otherwise), either (1) because it did not clearly state its intent in the Certificate of Entry for the Club's Liability coverage to extend to situations where Lafarge acquired an insurable interest in a vessel through bailment; or because of its failure to comply with any conditions of the Club coverage, *i.e.* failure to report over 3,000 prior similar transactions." Brief for AHCA and NACA dated December 11, 2008 at 7.[4]

The case for Lafarge is that it did not breach the Maintenance of Underlying Insurance provision in the Excess Policy because the American Club Policy was "maintained in full effect" during the currency of the Excess Policy, as that provision requires. Lafarge stresses that "[t]he American Club policy listed in the Maintenance of Underlying Insurance Clause is the one that Lafarge actually procured," Lafarge "indisputably maintained all the coverage that the American Club policy provided," and "[]he American Club never alleged that coverage was not in full force, and this Court never made such a finding." Briefs for Lafarge dated December 22, 2008 at 4, and November 13, 2008 at 11. These assertions all appear to be true. There is no evidence in the record

---

[4] The reference to "3,000 prior similar transactions" reflects the evidence in the record that during the terms of Lafarge's P&I policies with the American Club, it utilized some 3,000 barges to carry cement pursuant to agreements similar to that with Ingram covering Barge ING 4727, described in the Court's opinion in *American Club*.

19

that Lafarge failed to pay the premiums on the American Club Policy, or in any other way allowed the policy to lapse.

The question that arises is whether Lafarge "maintained in full effect" the American Club Policy, as those words are used in Paragraph 11(A) of the Excess Policy. The key word is "maintained," the past tense of the verb "maintain," which being left undefined by the Excess Policy, carries its ordinary meaning: "to keep or keep up . . . ; to continue in existence or continuance," Webster's Unabridged Dictionary 1087 (2d ed. 1979); "to keep in existence or continuance; preserve; retain; to keep in due condition, operation, or force; keep unimpaired," Random House Dictionary of the English Language 807 (1969; "to continue or preserve in or with; to hold or keep in any condition, esp. in a state of efficiency or validity," Webster's New Collegiate Dictionary 507 (1951); "to keep up, preserve, cause to continue in being; to cause to continue in a specified state, relation or position," Oxford English Dictionary 1698 (1st ed. 1971). If one prefers the resources of the Internet, "to keep up or carry on; continue; to keep in an existing state; preserve or retain," Free Online Dictionary, quoting The American Heritage Dictionary of the English Language (4th ed. 2000) (visited January 28, 2009).[5]

_____

[5] Courts routinely consult dictionaries to ascertain the ordinary meaning of words that are not defined in the document containing them. A very recent example is the Supreme Court's decision in *Crawford v. Metropolitan Government of Nashville and Davidson County, Tennessee*, No. 06-1595 (decided January 26, 2009). The Court held that the antiretaliation provision in Title VII of the Civil Rights Act of 1964, 42U.S.C. §2000e-3(a), extends to an employee who speaks out about discrimination not on her own initiative, but in answering questions during an employer's internal investigation into a complaint lodged by another employee, and was subsequently fired. She sued the employer under Title VII. The statute makes it unlawful "for an employer to discriminate against any of his employees . . . [1] because he has opposed any practice made an unlawful employment by this subchapter . . . " The lower courts held that plaintiff could not come within that provision because she had not instigated or initiated any complaint, but had merely answered questions by investigators in an already-pending internal investigation, initiated by someone else. The Supreme Court reversed, stating:

Construing the Excess Policy at issue in this case, I think it plain that (1) the Maintenance of Underlying Insurance provision obligated Lafarge to "maintain," that is to say, "keep in existence," the American Club Policy listed in the Schedule of Underlying Insurance, but do no more than that; and (2) Lafarge complied with that obligation. It follows that the Excess Insurers cannot avoid or defer their obligations to respond, or cast upon Lafarge the burden of a self-insurer's retained risk.

Of course, the Excess Insurers would prefer that the American Club pay out of its pocket the amounts its Policy would require if that Policy covered the Barge; or, if the American Club Policy did not cover the Barge, Lafarge pay out of its pocket what the American Club would have paid if it did. Given the Court's holding in *American Club*, the latter circumstance obtains; but I am unable to discern in the Excess Policy an obligation on the part of Lafarge to remedy the diminution of primary coverage brought about by this Court's decision.

That diminution in primary coverage was not caused by any failure on the part of Lafarge to "maintain" the American Club Policy. Lafarge obtained the American Club Policy described in the Schedule and maintained it in full force and effect. The diminution in primary coverage which distresses the Excess Insurers was caused – viewing the world through their eyes – by the failure of this Court to interpret the American Club Policy correctly. This Court's decision was right or it was wrong. The Court of Appeals will tell us which. If it says this Court was wrong, then the world will be as the Excess Insurers prefer: the American Club will have to protect and indemnify Lafarge to the full extent required by the Club Rules, and the Excess Insurers will not have to respond until the

---

"The term 'oppose' being left undefined by the statute, carries its ordinary meaning." Slip op. at 4 (citation omitted). After consulting several dictionaries, the Court concluded that the ordinary meaning of "opposed" was sufficiently broad to include the plaintiff.

Club has done so. But what if the Court of Appeals says that this Court was right: that the American Club Policy described in the Excess Policy's Schedule of Underlying Insurance, and obtained and maintained by Lafarge, did not cover the Barge? Then the Excess Insurers are reduced to wishing that Lafarge had obtained a different sort of P & I policy than that described in the Schedule. But nothing in the Excess Policy gives the Excess Insurers the right to dictate to Lafarge what sort of primary coverage Lafarge should arrange. Lafarge, having listed the American Club Policy in the Excess Policy Schedule, was obligated to maintain it. Lafarge did so. The American Club Policy did not cover the Barge. While one can sympathize with the Excess Insurers' disappointment, I do not think they can complain of it to Lafarge.

I will assume for the sake of this discussion that, had they thought about it, Lafarge and the Excess Insurers would have all believed that the American Club Policy covered a barge such as Barge ING 4727, whose services Lafarge obtained as it did in the case at bar. Perhaps they did think about that question. The record is unclear. But if they all believed that coverage existed, and this Court was right, then they were all wrong. The question arises: who bears the cost of being wrong, Lafarge or the Excess Insurers?

I think the Excess Insurers must bear that cost. Lafarge did all the Excess Policy required of it, obtaining and maintaining the P & I policy specified in the Schedule. It is not unfair to cast the consequences of the Court's interpretation of that policy upon the Excess Insurers. NYMAGIC, AHAC and NACA are experienced marine underwriters. It is their business. They knew, or should have known, of the manner in which Lafarge conducted its operations. They knew, or should have known, of the American Club Policy's terms and conditions. If this Court correctly concluded that

22

the American Club Policy did not cover Barge ING 4727, the reasons why that is so were readily

apparent to the Excess Insurers long before Hurricane Katrina made landfall in New Orleans.

This conclusion is consistent with other provisions of the Excess Policy and recognized

principles of marine insurance. Paragraph 7 of the Policy's Excess Marine Liabilities Conditions

provides in part:

### OTHER INSURANCE

> If other valid and *collectible* insurance with any other insurer is
> *available* to the Assured covering a loss also covered by this Policy,
> other than insurance that is in excess of the insurance afforded by this
> Policy, the insurance afforded by this Policy shall be in excess of and
> shall not contribute with such other insurance, either as double
> insurance or otherwise.

(emphases added). While Paragraph 7 does not impact directly upon the Maintenance provision in

Paragraph 11, it recognizes the principle that "other insurance" must be "collectible" by and

"available" to the Assured in order to render the Excess Policy insurance "in excess of" such other

insurance. In the case at bar, the American Club Policy is not collectible by or available to Lafarge

because of this Court's decision in *American Club*.

There is authority for the general proposition that an excess policy must "drop down" (to use

marine insurance parlance) and fill the gap created by the non-existence of American Club coverage.

The Excess Policy at bar may fairly be characterized as an "umbrella," or in the vernacular, a

"bumbershoot" policy. Judge Sofaer used both terms in *Pacific Resources, Inc. v Oswego Shipping

Corp.*, No. 79 Civ. 1606, 1984 WL 928 (S.D.N.Y. Sept. 26, 1984), at *2:

> The "Bumbershoot" policies are excess insurance policies . . . . These
> umbrella policies are intended to fill any coverage gap which might
> occur when an assured's underlying or primary insurance limits are
> exceeded, or when underlying insurance covering the risk involved
> *does not exist*. As to losses covered by underlying insurance policies,

23

> the Bumbershoot responds only after those limits are exhausted, and
> as to losses *not covered by other insurance* it responds initially . . .

(emphases added).  Judge Bonsal, articulating the same principles in *Anne Quinn Corp. v. American*

*Manufacturers Mutual Insurance Co.*, 369 F.Supp. 1312, 1313 (S.D.N.Y. 1973), quoted Buglass,

*Marine Insurance and General Average in the United States*, 257-58 (1973):

> As to losses covered by the underlying insurances, the Bumbershoot
> policy responds only after the limits of the underlying insurances are
> exhausted; as to losses *not covered by other insurance*, the
> Bumbershoot responds initially subject to the deductible specified.

(emphasis added).[6]  This principle, that the issuer of a Bumbershoot policy "responds initially" to

a loss "not covered by other insurance," resonates in the case at bar, the Court having held that the

American Club Policy did not cover Barge ING 4727 and the losses following her breakaway.

For the foregoing reasons, I hold that Lafarge has not retained any risk and is not a self-

insurer.  The Primary Policy having been exhausted, and the Barge not being covered by any other

insurance, the Excess Insurers must now respond, in accordance with the terms, conditions, and

---

[6] The author of the quoted treatise, Leslie Buglass, was the leading practitioner, author and expert of his time in the fields of marine insurance and general average, that protocol of shared sacrifice in marine casualties unique to admiralty law, where specialists known as average adjusters issue statements of general average.  Buglass's expertise has been noted by a number of federal courts.  *See, e.g., Antilles Steamship Co., Ltd. v. Members of the American Hull Insurance Syndicate*, 733 F.2d 195, 201 (2d Cir. 1984) ("Leslie Buglass, a leading American commentator, describes the American adjusters' practice as follows . . . "); *Gibbar v. Calvert Fire Insurance Co.*, 623 F.2d 41, 44 (8th Cir. 1980) ("The insurer introduced testimony of Leslie Buglass, a recognized writer and expert on marine insurance policies.").

limitations of the Excess Policy.[7]  The judgment to be entered in the case will reflect these conclusions.[8]

## 2.  *The Fees and Costs of the Three Law Firms Retained by Lafarge*

### a.    Factual Background

To lay the background for this question, some factual exposition is necessary.  Apart from certain subjective evaluations by the persons involved, the following facts are undisputed.

Hurricane Katrina caused hundreds of barges and other vessels in the New Orleans area to break away from their moorings.  Devastation was widespread and communication disrupted.

---

[7]  The briefs for AHAC and NACA recognize that reality.  Their Reply Brief at 2-3 acknowledges that "if it is ultimately determined" that the American Club Policy did not cover the Barge and that non-coverage does not constitute a breach by Lafarge of the Maintenance of Underlying Insurance provision in the Excess Policy, "then the Excess Policy will provide excess coverage up to its limit above the primary insurance provided by NYMAGIC."

[8]  I reject Lafarge's alternative contention that the wording of a letter dated March 26, 2008, sent by counsel for NYMAGIC to counsel for Lafarge, constituted a waiver binding on all Excess Insurers of the coverage issues presented by these motions.  It is true, as Lafarge stresses, that the "Leader" provision in the Excess Policy identifies NYMAGIC as the "lead underwriter" and recites that "all alterations, additions, endorsements, settlement of claim, etc." agreed to by NYMAGIC are "binding on all remaining Underwriters participating hereon."  But I agree with the Excess Insurers that counsel's letter, read in the context of the contemporaneous exchanges of correspondence, cannot be construed as "asserting a coverage position being taken by NYMAGIC and the Excess Underwriters under the Excess Policy."  Opposing Brief at 5.  Moreover, counsel was careful to include this reservation in the March 26, 2008 letter: "Neither this letter nor any future communications shall be construed as a waiver of the rights and/or defenses available to NYMAGIC under the policy, at law or otherwise."  Waiver cannot grow in soil as stony as this.  There was no waiver of the present coverage issues by NYMAGIC as lead Excess Insurer, and hence no waiver binding on AHAC and NACA.  Lastly, the issue of coverage under the American club Policy was still pending in March 2008, and was not resolved until the Court's opinion in *American Club* on September 29, 2008.  The March 2008 letter from counsel cannot operate as a waiver by the Excess Insurers of their right to dispute the consequences of that subsequent decision upon the several layers of coverage, although I reject their arguments for the reasons stated in text.

During the week following the hurricane, Lafarge personnel received information indicating that Barge ING 4727 had broken free. And, of course, it was universally known that the levee had failed, flooding the Lower Ninth Ward. But Lafarge had no notice of a possible causal connection between the breakaway barge and the failure of the levee until September 8, 2005, when a reporter for the *Wall Street Journal* telephoned Josh Lawson, Lafarge's risk manager, for comment on a story it was preparing to publish. The article appeared in the paper's September 9, 2005 issue. The headline read: "Still Unknown: Did a Barge Breach the Levee?" The article identified Ingram as the owner of a barge that had broken loose from a terminal operated by Lafarge, and ascribed to the Army Corps of Engineers a statement that "one possible cause of this breach [of the levee] is that the barge smashed through." The article also quoted the entirely predictable statement by Ingram's chief legal officer that "it would have been the terminal's responsibility to secure it in advance of the storm."

On September 8, immediately after receiving the *Wall Street Journal*'s inquiry, Lawson informed L. Philip McClendon, Lafarge's general counsel. McClendon, now retired, says in his declaration ("McClendon Decl.") at ¶ 4: "Based on the reports of widespread death and devastation from the flooding in the New Orleans area, it became immediately apparent that allegations that a breakaway barge had caused the flooding and the potential liability exposure could place Lafarge in a situation that threatened the viability and existence of the company."[9] On that day, McClendon retained the Washington, D.C. law firm of Goodwin Procter LLP ("Goodwin"), because he believed that Lafarge "needed to engage attorneys with top credentials to conduct an investigation, to monitor developments and to report to the company's senior management," and Goodwin "is a top law firm

---

[9] The statute limiting liability in admiralty cases is not available to Lafarge because it was not the owner or a bareboat charterer of the Barge.

with a national reputation and had represented Lafarge in class action/mass tort and other complex litigation." *Id*. at ¶¶ 5-7. McClendon also retained the New York law firm of Holland & Knight ("H&K") because he knew that H&K "had a prominent marine investigation and litigation practice." *Id*. at ¶ 10. H&K mobilized a team ("Rapid Response Team," in the parlance of marine casualties) which, together with Goodwin attorneys, went to New Orleans and began an investigation during the weekend of September 10-11. McClendon also decided, after consultation with the Goodwin senior partner on the case, that Lafarge "would likely need to retain local counsel in New Orleans." Lafarge had previously been represented by the New Orleans firm of Chaffe McCall LLP ("Chaffe'), which "had a sizable maritime practice," and on September 9 he retained Chaffe "to serve as local counsel and to assist Goodwin Procter and Holland & Knight with the local investigation details." *Id*. at ¶ 11.

On September 9, 2005, Lawson telephoned Raymond Miles, an officer of Willis of New York, Inc., Lafarge's insurance broker. Lawson instructed Willis to provide notice of possible claims against Lafarge to all insurers that might become involved. Willis gave notice by telephone that day to Shipowners Claims Bureau, the American Club's managers, and to Mutual Marine Office, Inc. ("MMO"), managers for NYMAGIC. A Willis representative named Mark Bernstein spoke to Paul Smith, an MMO claims adjuster, on September 9. Bernstein told Smith about the Barge breakaway and the possibility of claims against Lafarge. During that conversation Smith "was also advised that Lafarge, without NYMAGIC's knowledge or consent, had retained the New York law firm of Holland & Knight to assist Lafarge with 'damage control' regarding the breakaway of Barge ING 4727." Smith Declaration dated October 30, 2008 ("Smith Decl.") at ¶ 13. Bernstein did not tell Smith that Lafarge had also retained the Goodwin and Chaffe firms.

27

MMO acknowledged Willis's notice in a fax dated September 13, 2005 from Smith to Lawson. Smith told Lawson that he was setting up a file and would "await further details or other developments." He added: "Please note that we have good counsel in New Orleans, Messrs. Sutterfield and Webb, who we would like to involve should there be any significant claim against Lafarge in this matter."

During the weekend of September 10-11, Mark Raffman, a Goodwin partner, went to New Orleans with H&K attorneys and began their investigation "into the circumstances of the breakaway of barge ING 4727 and the collapse of the IHNC levee" by interviewing Lafarge employees. Declaration of Mark Raffman ("Raffman Decl.") at ¶ 10. On Monday, September 12, James Shirley, an H&K partner "experienced in marine investigations," arrived on the scene. These attorneys, together with Jason Fernandes, a marine surveyor, began "a field investigation of the barge casualty, including inspections of the Lafarge terminal, the levee and Barge ING 4727. By September 13, 2005, Lafarge's investigation into the barge casualty was well underway, under the direction of lawyers from Goodwin and H&K." *Id*. at ¶¶ 13-15. "During the fall of 2005, Goodwin had primary responsibility for oversight, communication, and all legal issues dealing with potential mass tort liability; H&K had the lead on maritime issues and investigation, and Chaffe provided necessary local support." *Id*. at ¶ 19A. H&K was retained because while "Goodwin's litigation department specializes in mass tort/class action matters, . . . the firm's maritime expertise is limited." *Id*. at ¶ 17.

Lafarge retained Goodwin, H&K, and Chaffe entirely on its own initiative, without consulting or advising NYMAGIC, and without the knowledge, consent, approval or authorization of NYMAGIC.

28

On September 20, 2005, Lawson advised Smith for the first time that Lafarge had retained the Goodwin and Chaffe firms in addition to H&K. Smith responded to that advice in a fax dated September 22 which stated in part: "For defense, we wish to assign one of the Louisiana firms on our 'Panel Counsel' list." The fax then listed six firms by name, the first being Sutterfield & Webb ("Sutterfield"). The record does not reflect whether Lafarge replied directly to Smith's fax, or commented on the six Louisiana firms NYMAGIC wished to retain. However, Smith says, and it does not appear to be disputed, that "Lafarge would not consent to any of the six law firms proposed by NYMAGIC," Smith Decl. at ¶ 23, and "made it clear that they intended to continue to employ Goodwin Procter, Chaffe McCall and Holland & Knight," second Smith Declaration dated December 10, 2008, at ¶ 12. In that circumstance, on September 28 Smith sent Miles an e-mail, stating on behalf of NYMAGIC: "[T]he issue of who will pay the bills remains unsolved. I can agree to the costs of the experts and surveyors but I cannot agree to pay for the three sets of attorneys on the case, none approved by us." In a second e-mail on September 28, Smith advised Miles: "We have decided to appoint Sutterfield & Webb as defense counsel in Louisiana and I have copied Dan Webb to give you the email address he is using until the post-Katrina return to his office."

Lafarge instructed Raffman, the Goodwin partner, to cooperate with Sutterfield "and to bring Dan Webb, of that firm, up to speed." Raffman Decl. at ¶ 62. The first claim against Lafarge in the Eastern district of Louisiana was filed on November 3, 2005. *Id.* at ¶ 25. As claims and actions mounted against Lafarge (and others), Goodwin and Chaffe, "with the assistance of Sutterfield," acted as Lafarge's counsel of record in the Louisiana courts, federal and state; Goodwin had "overall responsibility for the litigation," and Chaffe handled "most of the maritime and local procedural

29

issues, as well as handling numerous local aspects of the investigation and litigation tasks." *Id.* at

¶ 64.

In an affidavit sworn to on October 30, 2008, Smith says at ¶¶ 30-31:

> NYMAGIC has paid the approved legal fees and expenses of Sutterfield & Webb and Lafarge's expert fees and costs under the Primary Policy. To date, NYMAGIC has paid a total of $ 5 million in legal fees, expert fees, indemnity and costs under the Primary Policy. As a result, the Primary Policy limits of $5 million have been exhausted.
>
> In addition, under the Excess Policy, NYMAGIC has paid and continues to pay its 40% share of the approved legal fees and expenses billed by Sutterfield & Webb and experts retained by Lafarge.

Smith also states that "NYMAGIC has not authorized, approved or consented to the legal fees that

have been, and will continue to, be charged by Goodwin Procter, Chaffe McCall and Holland &

Knight." *Id.*at ¶ 29.[10]

These facts set the stage for the present controversy. The Goodwin and Chaffe firms

continue to defend Lafarge's interests in the Louisiana litigation. To that end, these firms cooperate

and work in tandem with the Sutterfield firm. The Primary Policy having been exhausted,[11] the

---

[10] It would appear that no future bills will be rendered by Holland & Knight. Raffman says that "[w]hen the initial investigation was completed by early 2006, H&K's involvement ceased and Chaffe assumed a broader role as both maritime and local counsel." Raffman Decl. at ¶ 20.

[11] Smith says in a second Declaration dated December 10, 2008, at ¶¶ 19-20 that "[t]he limits of the Primary Policy were effectively exhausted on or about September 11, 2008," and "[t]hereafter, NYMAGIC has paid and continues to pay under the Excess Policy its proportionate share of the reasonable and approved expert and legal fees incurred by Lafarge under a reservation of rights." These facts do not appear to be in dispute. "Approved" legal fees, of course, do not, in the Insurers' eyes at least, include the fees of Goodwin and H&K.

30

Excess Insurers (including NYMAGIC as lead Excess Insurer) bear whatever obligations exist to pay the fees and costs of these attorneys and the fees and costs of experts.

NYMAGIC, now cast as the lead Excess Insurer, is paying 40% of the Sutterfield fees and 40% of experts' fees. It is not clear that AHAC or NACA are paying anything to anybody. [12] According to the declaration of John H. Shelonko, a Lafarge vice-president, as of November 11, 2008 Lafarge has incurred $10,536,216.53 for legal investigative and defense costs billed by the three firms it retained (Goodwin, H&K, and Chaffe), and has paid $361,184.35 for experts' expenses, all unreimbursed by the Excess Insurers. Whether the Excess Insurers are obligated by the policies to reimburse Lafarge for those amounts is the question presented for decision on these motions. I turn to the policy provisions.

### b.    The Policy Provisions

NYMAGIC, which takes the laboring oar on the issue, relies principally upon two provisions in the Primary Policy and one in the Excess Policy.

The Primary Policy provides:

#### 4. NAMING ATTORNEYS:

This Company [NYMAGIC], in consideration, in consultation with [*sic*] the Assured [Lafarge] shall have the option of naming any mutually acceptable attorneys who shall represent the Assured in the prosecution or defense of any litigation or negotiations between the Assured and third parties concerning any claim based on a liability or

---

[12] It would seem that they are not. The Opposing Brief for AHAC and NACA says at 14: "Because Excess Insurers contend that Lafarge may have breached a promissory representation contained in the Excess Policy (*i.e.* the Maintenance of Underlying Insurance provision), Excess Insurers are not required to follow NYMAGIC's limited decision to pay only the above specifically identified counsel fees and expenses." (citation omitted). AHAC and NACA cannot sustain that contention, because the Court has held in Part II.E.1. that Lafarge did not breach the Maintenance provision.

alleged liability covered by this policy, and shall have the direction of such litigation's [*sic*] or negotiations. If the Assured shall fail or refuse to settle any claim as authorized by this Company, the liability of this Company shall be limited to the amount for which settlement could have been made.

*     *     *     *     *

### 11. <u>SURVEY AND LEGAL EXPENSES:</u>

This Company [NYMAGIC] is also to pay survey and related expenses reasonably incurred by the Assured [Lafarge] and the legal cost and expense of defending and/or investigating and/or conducting proceedings to limit liability on any suit or claim against the Assured based on a liability or an alleged liability coming within the scope of this insurance, without application of the deductible provisions of this policy, but this Company shall not be liable for the cost or expense of defending any suit or claim unless such cost or expense shall have been incurred with the written consent of the Company. This Company, however, reserves the right to conduct the defense of any actions or suits at its own expense.

The Excess Policy provides:

### 4. <u>ASSISTANCE AND COOPERATION:</u>

This Company [the Excess Insurers] shall not be called upon to assume charge of the settlement or defense of any claim made or suit brought or proceedings instituted against the Assured [Lafarge], but this Company shall have the right and shall be given the opportunity to associate with the Assured or the Assured's Underlying Insurers, or both, in the defense and control of any claim, suit or proceeding relative to an occurrence where the claim or suit involves or appears reasonably likely to involve this Company in which event the Assured, the Underlying Insurers and this Company shall cooperate in all things in the defense of such claim, suit or proceeding.

For its part, Lafarge acknowledges the relevance of these provisions (although it reads them differently). Lafarge relies upon a proviso in Paragraph 5 of the Primary Policy's General Provisions, captioned "Settlement of Claims." That paragraph provides that the Assured shall not

32

make any admissions of liability or interfere with settlement negotiations conducted by the Insurer,

but goes on to say:

> [p]rovided, however, that in respect of any occurrence likely to give rise to a claim under this policy, the Assured is obligated to and shall take such steps to protect his and/or this Company's interests as would reasonably be taken in the absence of this or similar insurance.

Lafarge also relies upon these provisions in the Excess Policy:

### COVERAGE:

> This policy is to indemnify the Assured in respect of the following marine liabilities (including such expenses as are set out in the definition of "ULTIMATE NET LOSS") arising out of the Assured's marine operations only: . . .

This paragraph then lists the "marine liabilities" covered by the Excess Policy. It is not necessary

to reproduce that language because it is undisputed that Lafarge's potential liabilities for the Barge

breakaway are covered by the Excess Policy. The definition of "Ultimate Net Loss," incorporated

by reference in the Coverage provision just quoted, provides in pertinent part:

### ULTIMATE NET LOSS:

> The term "Ultimate Net Loss" shall mean the total sum which the Assured becomes obligated to pay by reason of matters set out in Insuring agreement I, including compromise settlements, and shall include hospital, medical and funeral charges and all sums paid as salaries, wages, compensation, fees, charges and law costs, premiums, on attachment or appeal bonds, interest, expenses for doctors, lawyers, nurses and investigators and other persons, and for litigation, settlement, adjustment and investigation of claims and suits which are paid as a consequence of any occurrence covered hereunder, excluding, however the salaries of the Assured's permanent employees and general office overhead and also excluding any part of such expenses for which the Assured is covered by other valid and collectible insurance.

33

### c.     Analysis of Coverage

The devastation wrought by Hurricane Katrina, and the deaths, injuries, and property loss it

caused constituted an unprecedented natural disaster. The devastation, deaths, injuries and property

loss caused by the destruction of the World Trade Center towers constituted an unprecedented

terrorist attack. Both incidents generated massive litigation. Judge Hellerstein of this Court is

overseeing the World Trade Center litigation. In *In re September 11th Liability Insurance Coverage

Cases*, 458 F.Supp.2d 104 (S.D.N.Y. 2006), Judge Hellerstein examined layers of primary and

excess insurance policies to determine "whether the insurers who covered the lessees of Towers One

and Two of the World Trade Center on September 11, 2001 against loss and liability, excluded

defense costs from their coverage." *Id.*at 108. His task resembles mine in the case at bar. Judge

Hellerstein's opinion articulates principles applicable to this case:

> I am bound to enforce these final policies in accordance with the plain meaning of their terms. Here, the policies issued by six of the named insurers expressly disclaim any duty to defend. . . .
>
> Despite the clear rejection of defense costs in the above policies, the WTC Entities urge nevertheless that such disclaimers should be disregarded as in contravention of the intent of the parties. It is axiomatic that the clearest evidence of what the parties intended is the language of the agreement itself. Thus, I may not disregard clear provisions which the insurers inserted in an insurance policy and the insured accepted. . . . The terms of the Policies are binding.
>
> In marked contrast, the Royal Policy expressly assumes a limited duty to defend, providing that Royal "will have a duty to defend . . . claims or suits against the Inured when the applicable limit of insurance of the Underlying Insurance has been exhausted." Since the language of the Royal Policy clearly assumes a duty to defend, I hold that Royal assumed such a duty, even if it did so alone among all other insurers.

*Id.* at 128-29 (citations, internal quotation marks, and brackets omitted).

I will first consider the disputes arising out of the retention and refusal to retain attorneys defending Lafarge against Katrina claims. Lafarge initially retained the Goodwin, H&K, and Chaffe firms, and continues to retain Goodwin and Chaffe. All the Insurers refuse to pay any of these firms' fees. NYMAGIC expressed to Lafarge an initial preference for the Sutterfield firm as Lafarge's New Orleans attorneys, subsequently suggested six firms (including Sutterfield) to Lafarge, and when Lafarge did not select any of them, retained Sutterfield, whose fees NYMAGIC has and continues to pay. NYMAGIC now asks for a declaration that, in doing so, it satisfied its obligation under the Primary Policy to defend Lafarge.

These disputes arise principally out of the Primary Policy issued by NYMAGIC. However, that policy's terms relevant to the naming and compensation of attorneys to defend Lafarge for covered occurrences do not have the "plain meaning" discerned by Judge Hellerstein in the WTC case. The Naming Attorneys provision states that NYMAGIC, "in consultation" with Lafarge, "shall have the option of naming any mutually acceptable attorneys who shall represent" Lafarge. If the drafters of this language had deliberately set about to sow the seeds of future controversy, it is difficult to see how they could have done it better. What is the strength of NYMAGIC's "option" to name attorneys if it must exercise that option "in consultation with" Lafarge, and the named attorneys must be "mutually acceptable"?[13] These linguistic imprecisions lead the two sides to stake out extreme positions: Lafarge and the Insurers each claim, at least implicitly, the right to select its attorneys and the power to veto the other's selection.

---

[13] The noun "option" usually connotes a one-sided power. The first definition in *Black's Law Dictionary* (7th ed. 1999) at 1121 is: "The right or power to choose."

I cannot accept either position as representing the parties' shared intent. With respect to the retention of attorneys, Lafarge and NYMAGIC were and are obligated to act reasonably in the circumstances, while giving effect to all relevant provisions in the Primary Policy.

I will first consider Lafarge's retention of the Goodwin and H&K firms, reserving for later Lafarge's retention of the Chaffe firm.

Lafarge's retention of the Goodwin and H&K firms on September 8, 2005 was eminently reasonable. On that date, as the result of the *Wall Street Journal* reporter's call, Lafarge learned of a potential claim that Barge ING 4727 breached the levee after breaking away from the Lafarge facility. McClendon, Lafarge's general counsel, recognized immediately that if in fact contact with the Barge breached the levee, and Lafarge was at fault for her breakaway from the wharf, Lafarge's unlimited liability to the victims of the resulting flooding would be the company's death knell. McClendon also knew that the devastation wreaked by Hurricane Katrina had displaced and distracted New Orleans law firms. In those circumstances, it was reasonable for Lafarge to retain at once a large firm such as Goodwin, with complex case and mass tort experience, to take immediate control of Lafarge's defense against the anticipated litigation flood (which in fact materialized).

It was also reasonable for Lafarge to retain an admiralty firm such as H&K, with experience in the "rapid response" investigation and evaluation of major marine casualties. H&K's specific task was to "coordinate a marine investigation into the breakaway of Barge ING 4727 and the collapse of the IHNC levee." Raffman Decl. at ¶ 10. During the last two weeks of September, H&K worked together with Goodwin to engage Dr. Charles R Cushing, a recognized maritime expert, who "quickly assembled a team of experts in disciplines such as hydrology and soil science, and traveled

36

with his team to New Orleans" in order to "investigate the barge breakaway and the allegations that the barge had caused the failure of the IHNC levee."*Id.* at ¶ 16.

Once Lafarge had retained Goodwin, and the Goodwin attorneys took control of the litigation, first anticipated and then actual, it was reasonable for Lafarge to continue that retention. In contrast, once H&K's investigation had been completed and its reports submitted, Lafarge took the equally reasonable step of discharging that firm.

While it appears that NYMAGIC has paid for at least some of the experts' fees and costs, it has refused to pay any of the fees submitted by Goodwin and H&K. NYMAGIC offers several excuses for that refusal, none of them persuasive.

NYMAGIC's briefs stress repeatedly that Goodwin is from Washington, D.C. and H&K from New York City. The tone is disapproving, as if Lafarge had brought in counsel from Sodom and Gomorrah. The relatively large number of attorneys at each firm is also stressed, again disapprovingly, as if every lawyer in the firm worked on the Barge case and billed accordingly. The case for NYMAGIC is that with respect to the retention of attorneys, it satisfied its obligations to Lafarge under the Primary Policy by hiring and paying for Sutterfield, a small New Orleans maritime firm. But the geographic location of law firms is less important, in these days of jet travel and electronic communication; and Goodwin's representation of Lafarge throughout has been directed, as one would expect, by two partners, not the entire firm.

NYMAGIC stresses that Lafarge retained Goodwin and H&K, before a single claim had been asserted against it (the first court action naming Lafarge was filed in Louisiana in November 2005). But trial lawyers and claims adjusters know that the prompt identification and preservation of evidence – physical, documentary, and testamentary – after a major casualty is vital. In this case,

37

the physical conditions of the Barge, the unbreached sections of the levee, and the soil and banks on either side of the breaches may be probative on the core question of causation: evidence that could be lost or compromised if not garnered quickly and preserved carefully. Witnesses must be located and interviewed quickly, lest their identity or whereabouts become unknown, or memories fade or become embellished, diminishing the accuracy of the accounts and the credibility of the witnesses. These potential losses of vital evidence are only examples. Lafarge acted reasonably in retaining counsel of quality as soon as it learned of the potential of ruinous claims against it.

NYMAGIC stresses that Lafarge did not retain Goodwin and H&K with NYMAGIC's prior knowledge or consent. But the Primary Policy provided that "in respect of any occurrence likely to give rise to a claim under this policy, the Assured is obligated to and shall take such steps to protect his and/or the Company's interests as would reasonably be taken in the absence of this or similar insurance." The breakaway of the Barge during Hurricane Katrina is a paradigmatic example of an "occurrence likely to rise to a claim under the policy." Lafarge's prompt retention of Goodwin and H&K, eminently reasonable in the circumstances for the reasons stated, were consistent with Lafarge's policy obligations. It comes with ill grace for NYMAGIC to contend otherwise, since it did not commission any investigation of its own into the incident and has received full disclosure of the fruits of Lafarge's.

Lafarge reads Paragraphs 4 and 11 of the Primary Policy together to mean that NYMAGIC's "option of naming any mutually acceptable attorneys" extends only to the selection of counsel to conduct Lafarge's legal defense. If that interpretation is correct, NYMAGIC would have no say in Lafarge's selection of experts or other lay investigators, or for that matter the retention of attorneys to perform "investigative" as opposed to "legal defense" services; NYMAGIC's obligation under

the Primary Policy to reimburse Lafarge for such expenditures is absolute, even if not previously approved. The question is interesting, but its significance lessened by NYMAGIC's payment by September 2008 of $5,000,000 in expert and related non-legal costs. That was not the fact when NYMAGIC filed its declaratory judgment action in November 2005, but it is the fact now; and the practical consequence is that the Primary Policy has been exhausted and all future payments to Large by Insurers will fall under the Excess Policy.

Nonetheless, the reasonableness of Lafarge's retention of the Goodwin, H&K and Chaffe firms remains pertinent. If its retention of a particular firm was reasonable in the circumstances then existing, the subsequent exhaustion of Primary Policy coverage does not make that retention unreasonable. Conversely, if Lafarge acted unreasonably in retaining a particular firm, that retention is not redeemed by the Primary Policy's exhaustion.

Moreover, and contrary to Lafarge's assertion, AHAC and NACA as following Excess Underwriters have standing to be heard on these issues. They purchase that standing by their obligation to pay 35% and 25% respectively of the legal fees and costs billed by firms Lafarge reasonably retained.

I have previously concluded that Lafarge's retention of the Goodwin and H&K firms, at the times and for the purposes stated, was reasonable and consistent with its obligations under the Primary Policy. It only remains to say on this subject that the Insurers consistently understate the magnitude of the challenges and perils confronting Lafarge. Thus NYMAGIC's Opposition Brief says at 7-8 n.2: "While the Katrina litigation has many claimants seeking billions of dollars, there are essentially 6 cases and they are all located in one jurisdiction, which are all consolidated under E.D. La. C.A. No. 05-4182." On liability issues, that is "essentially" the equivalent of a power boat

on Lake Pontchartrain swamping 6 sail boats. Lafarge gives a more accurate summary in its Reply Brief at 7: "[N]o fewer than four separate class action complaints have been filed against Lafarge, some with putative classes as large as 40,000 members, seeking damages as high as $100 billion. No fewer than 900 docket entries were made in the Katrina Barge Litigation when it was pending before Chief Judge Berrigan, and no fewer than 16,000 docket entries have been made in the consolidated Katrina Litigation pending before Judge Duval. At least 28 other parties, including insurers as direct action defendants, are or have been co-defendants of Lafarge in the Katrina Barge Litigation." The effective management and defense of litigation of such magnitude and complexity reasonably require a firm with the resources and mass tort experience of a Goodwin Procter. Lafarge's retention of the H&K firm, limited in time and mission and principally for that firm's expertise in immediate post-casualty investigation, was equally well advised. In sum: It is manifest that Lafarge acted reasonably and in accordance with its Primary Policy obligation when it retained the Goodwin and H&K firms on September 8-9, 2005.

I reach a different conclusion with Lafarge's retention of the Chaffe firm as its local maritime attorneys.

There is no dispute that Lafarge requires local representation by a Louisiana firm well versed in admiralty law. The issue is whether Lafarge was entitled, consistent with the Naming of Attorneys provision in the Primary Policy and concepts of reasonableness, to insist upon keeping the Chaffe firm while rejecting, with no stated or discernible basis, all six New Orleans admiralty firms proposed by NYMAGIC shortly after the Barge incident.

Lafarge labors mightily to create the impression that NYMAGIC never relented upon its insistence that Lafarge be represented in New Orleans by the Sutterfield & Webb firm. This was

40

unreasonable, Lafarge argues, because Sutterfield has only 5 attorneys. I *know* Sutterfield has only 5 attorneys. Lafarge tells me that at least 55 times in its briefs. Lafarge also stresses that the demands of post-Katrina litigation require local representation of Lafarge by a larger firm. That is a red herring. No sane, let alone reasonable, insured or insurer would contend otherwise. But Lafarge's suggestion that NYMAGIC never suggested or considered a firm other than Sutterfield seriously distorts the record.

On September 9, 2005, in the phone conversation between Bernstein and Smith, Lafarge first advised NYMAGIC of potential Barge claims, presaged by the *Wall Street Journal* heads-up. Bernstein told Smith that Lafarge had retained the H&K firm, but said nothing about its retention of Goodwin and Chaffe. On September 13, Smith responded for NYMAGIC that he was setting up a file, awaited further details, and added that "we have good counsel in New Orleans, Messrs. Sutterfield and Webb, who we would like to involve should there be any significant claim against Lafarge in this matter." At this stage, NYMAGIC's response, including an expressed preference for Sutterfield, was entirely reasonable.

By September 20, the situation on the ground (or in the waters) was clarifying. By now, all interested parties knew or should have known that Lafarge's potential liability threatened the life of the company.[14] On September 20, Lawson advised Smith for the first time that eleven days earlier

---

[14] It is perhaps unnecessary to add that by noting that economic reality, this Court intimates no view with respect to whether there is a basis in fact or law to hold Lafarge liable for the breaching of the levee and the consequent flooding of the Lower Ninth Ward. Liability issues will be determined in the Eastern District of Louisiana.

Lafarge had retained the Goodwin and Chaffe firms.[15] Smith responded by fax on September 22 that NYMAGIC wished to retain one of the Louisiana firms on its "Panel Counsel" list. The fax listed six firms by name. That list, with the number of attorneys at each firm stated in parentheses, is as follows: McGlinchey Stafford (160); Lemle & Kelleher (70); Murphy Rodgers & Sloss (15); Hailey McNamara Hall Larman & Papale (40); Maginnis & Hurley (5); and Sutterfield & Webb (5). Each firm is experienced in admiralty law and practice and the sort of litigation generated by marine casualties.

To that suggested list of firms, Lafarge made no recorded response whatsoever. The affidavits of Lafarge's officers and representatives are replete with condemnations of NYMAGIC's conduct and justifications of its own; but one searches the record in vain for any contemporaneous account by Lafarge of the consideration, if any, it accorded NYMAGIC's list of law firms or its reasons, if any, for failing to accept one of them. This eloquent silence supports Smith's impression that Lafarge "intended to continue to employ Goodwin Procter, Chaffe McCall and Holland & Knight," no matter what other Louisiana firms NYMAGIC suggested.

After the fact, Lafarge's briefs characterize NYMAGIC's suggested list of firms as insincere, illusory and in bad faith. There is no evidence in the record to support these conclusory epithets, and no discernible reason to suppose that if Lafarge had promptly responded to Smith's September 22 fax and accepted, say, Lemle & Kelleher as its local counsel, NYMAGIC would not have paid

---

[15] Lafarge neither denies nor attempts to justify this delay in notification. Its conduct in that regard was unreasonable, but that does not affect the reasonableness of Lafarge's earlier retention of those two firms.

Lemle's fees and would be doing so today, first as Primary Insurer and now as lead Excess Insurer.[16] At this very early stage of the case, there was no practical obstacle to Lafarge substituting a firm suggested by NYMAGIC for Chaffe. Lafarge having failed to accept any of these firms to represent its interests, on September 28 NYMAGIC retained Sutterfield to represent its own. In doing so, NYMAGIC cannot fairly be indicted, as Lafarge suggests, for foolishly retaining a 5-attorney firm to handle litigation of unprecedented size and complexity. By September 28, it was apparent to NYMAGIC that Lafarge was persisting in its retention of Chaffe, a local firm with the requisite resources and experience to play that supporting role. In those circumstances, NYMAGIC reasonably retained the smaller Sutterfield firm to hold a watching brief for its own protection. That is the way it has played out. With commendable professional courtesy, and in compliance with Lafarge's obligation under the policies to cooperate with its insurers, Chaffe includes Sutterfield in conferences and local litigation procedures of common interest to insurer and insured.

Lafarge had and has the right to be represented locally by the Chaffe firm. However, Lafarge did not have the right under the Primary Policy, and does not have the right under the Excess Policy, to require the Primary or Excess Insurers to pay for that representation. The fees and costs of the Chaffe McCall firm were and remain the responsibility of Lafarge as the Assured under the policies.

### d.    Reasonableness of the Amounts of Attorneys' Fees and Costs

It follows from the foregoing analysis that NYMAGIC, AHAC and NACA are responsible under the policies for the reasonable fees and costs of the Goodwin and H&K firms. To the extent Lafarge has paid these charges, the Excess Insurers must reimburse it, in accordance with the

---

[16] Lafarge did not and does not argue, and could not, that none of the six firms suggested by NYMAGIC had resources and expertise equal to that of Chaffe, which according to its present Website has 66 attorneys.

43

percentages specified in the Excess Policy. The Excess Insurers must also pay these firms' future billings, following the same allocation, but subject, of course, to the Policy limitations.

All parties agree that the Insurers are responsible to pay only the "reasonable" fees and costs of attorneys. Predictably, the point is disputed. The Insurers attack the services of the firms as duplicative and their fees as excessive. Lafarge defends the time spent and the fees charged. Contrary to Lafarge's contention, these issues are not appropriate for summary disposition. An Order of Reference will be made to a Magistrate Judge to hear the parties and file proposed findings and recommendations with the Court, after conducting such evidentiary hearing as the Magistrate Judge thinks right in the exercise of his or her discretion.

### e.     Lafarge's Claim for Attorneys' Fees on These Motions

Lafarge contends that it is entitled to recover from the Insurers its attorneys' fees incurred in litigating the present motions. I do not agree. There is some authority for the proposition that an insured, forced to sue its insurer to redress an unjustified denial of cover, may recover its attorneys' fees from the insurer if coverage is upheld. In such a case, the insurer's denial of coverage was wrongful and the insured's conduct free of criticism. In the case at bar, the Insurers do not deny the existence of coverage; the issues are when and in what circumstances the coverage attaches.[17] Moreover, Lafarge's effort to have the Insurers pay for the Chaffe firm' services fails, for the reasons stated *supra*. The conduct and contentions of all parties are subject to criticism. In these

---

[17] With respect to AHAC and NACA, that distinction is nuanced: these Excess Insurers profess the existence of coverage in principle, but proclaim that in practice they need not pay any amounts under the Excess Policy. The asserted basis for that refusal to pay vanishes with this Opinion. *See* footnote 12, *supra*.

circumstances, and in the exercise of my discretion, I conclude that all parties should bear their own legal expenses on these motions.

### f.      Direction for the Entry of Final Judgments under Rule 54(b)

Concurrently with the entry of this Opinion, the Court will enter separate Judgments in these two previously consolidated cases. Because the Opinion and Judgments require a reference to a Magistrate Judge to consider the reasonableness of the covered attorneys' fees and costs, they will not resolve all the parties' claims. In that circumstance, the Court will direct the entry of final judgments as to the claims the Court  presently adjudicates, as authorized by Rule 54(b), Fed.R.Civ.P. The Court's reasoning for its Rule 54(b) certifications are set forth in its Rule 54(b) statements accompanying the Judgments, as required by Second Circuit authority.[18]


Dated:  New York, New York
          February 19, 2009

                                                   
CHARLES S. HAIGHT, JR.
SENIOR UNITED STATES DISTRICT JUDGE

---

[18]  The voluminous briefs assert many additional arguments and cite scores of cases. While I have considered each contention of counsel, in the view I take of the case I need not discuss them all and do not do so. Nor is it necessary to expand and delay this Opinion by analyzing all the cited cases. Insurance cases are fact-intensive. The conclusions stated in text are supported by established principles of law.

45